Filed 4/22/25  P. v. Wong CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER EUGENE WONG,<br><br>    Defendant and Appellant. | H051737<br>(Santa Clara County<br> Super. Ct. No. C2105488) |

Defendant Christopher Eugene Wong battered his girlfriend during an argument in April 2021.  In 2023, a jury convicted Wong of corporal injury on a cohabitant (Pen. Code,[1] § 273.5, subd. (a)) and assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)).  The trial court suspended imposition of sentence, placed Wong on probation, and ordered him to serve 45 days in the county jail.

On appeal, Wong contends the trial court prejudicially erred and violated his constitutional rights by precluding him from testifying about occasions in which his girlfriend acted violently toward him after the April 2021 incident.

---

[1] All further unspecified statutory references are to the Penal Code.

For the reasons explained below, we affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

In May 2023, the Santa Clara County District Attorney filed an information charging Wong with corporal injury on a cohabitant, C.K.[2] (§ 273.5, subd. (a); count 1), assault on C.K. by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), and threats against C.K. to commit a crime resulting in death or great bodily injury (§ 422, subd. (a); count 3).  The alleged offenses occurred on or about April 19, 2021.[3]

A. *Evidence Presented at Trial*

   1. <u>Prosecution Evidence</u>

C.K. and Wong began dating in November 2020 and were living together in April 2021.[4]

At trial, C.K. testified that on the night of April 18, she drank some whiskey while bartending at a sports bar.  Wong joined her at the bar.  After C.K.'s shift ended at midnight, she and Wong went to a friend's house.  There, they drank, partied, and sang karaoke.  Wong became upset after seeing C.K. and another man spend time in a bathroom.

C.K. and Wong left the party about 2:00 a.m. and returned to their apartment.  C.K. was "very drunk."  As C.K. prepared for bed, Wong got angry with her because of what he had seen at the party.  C.K. tried to explain to Wong that the man with whom she went to the bathroom was just a friend and nothing sexual had happened; rather, they snorted cocaine

---

[2] We refer to the victim by her initials to protect her privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4).)

[3] Unless otherwise indicated, all dates were in 2021.

[4] Between April 2021, and Wong's trial in September–October 2023, C.K. and Wong continued living together in the same apartment.  They also became engaged to be married in July 2021.

together. Wong "didn't want to hear it" and broke up with C.K. She was mad because she "wanted [Wong] to understand that nothing happened" between her and the man.

C.K. and Wong argued. He tried to leave their apartment, but C.K. blocked and pushed him. They were "wrestling around." She pushed him, and he pushed and shoved her back with his body, possibly including his elbow. Wong tried to move C.K. out of the way while she tried to force him to stay. C.K. would not let Wong leave because she "wanted him to understand and just calm down before he made any rash decisions."

Pursuant to a stipulation of the parties, the prosecutor read a portion of C.K.'s May 2023 preliminary hearing testimony to the jurors. At the preliminary hearing, C.K. testified that she had tried to stop Wong from leaving " 'because he was intoxicated' " and she " 'was trying to make sure he was safe.' " C.K. further stated, " 'We got in an altercation.' " " 'Hands were put on each other so it escalated.' " " 'He put hands on me and I put hands on him' " " '[t]o try to' " " '[g]et off each other.' " C.K. also said, " 'I put my hands [on] him trying to stop. And he tried to put his hands on me trying to get me to stop. And so it was more like we were wrestling kind of.' "

C.K. further testified at the preliminary hearing that Wong put his hands on her neck, but she could not recall details of what Wong did with his hands. She also could not remember if Wong had punched her. C.K. admitted pushing Wong and guessed she did that " '[i]n the middle of it all' " when "trying to stop."

Eventually, C.K. ran out of her apartment without her phone, keys, or clothes. A neighbor testified at trial about hearing C.K. screaming for help. C.K. ran into the neighbor's apartment, looking scared and asking for a phone to call 911. The neighbor gave C.K. a towel to cover herself because

C.K. was only wearing underwear. The neighbor saw Wong exit his apartment and asked Wong if everything was ok. He said it was. By the time of trial, the neighbor had lived next door to Wong for about five years. The neighbor had not otherwise heard any yelling or an incident like the one on April 19.

About 2:30 a.m. on April 19, San Jose Police Officer Patrick Taylor responded to C.K.'s 911 call. According to Officer Taylor, when he encountered C.K., she was crying, "frantic, hysterical, angry, [and] afraid." She had had watery, bloodshot eyes and was breathing hard. C.K. told Officer Taylor that she and Wong had been drinking throughout the night and got into an argument. Wong had asked C.K. for his keys, but she refused to give them to him. A "heated argument ensued. . . . [H]e started pushing her. And then he bit her hand. He started strangling [her] with one hand and punching her in the face with the other hand. And at some point he pushed her into the closet. [¶] And then when she was being strangled, she managed to get herself free, and then she ran out of the apartment and to the neighbor where she called 9-1-1." C.K. also said that Wong "was strangling her with two hands. And then he was also covering her mouth at one point so she couldn't breathe. She almost lost consciousness. And during the incident, . . . [Wong] said to her that 'You're going to die.' " C.K. told Officer Taylor that she did not lay hands on Wong.[5]

As a result of the altercation with Wong, C.K. sustained a bloody, swollen lip, a bite on her hand, and slight redness on her chest and upper

---

[5] C.K. testified at trial that she was "overexaggerating" when she told the police that Wong had punched her in the face with his fist. She denied that Wong had punched her and further testified that she did not recall him choking her. Additionally, C.K. admitted having been convicted of a felony in 2006 for selling a controlled substance.

neck. In addition, a false tooth—which had been held in place by a retainer— fell out of C.K.'s mouth "[w]hile [she and Wong] were wrestling."

After Officer Taylor spoke to C.K., he contacted Wong in a parking lot adjacent to his apartment. Wong was calm. He had abrasions on his elbows and "very small cuts" on his face and hands.

At trial, Richard Ferry testified as an expert on domestic violence and common experiences in intimate partner violence. Ferry described common misconceptions about intimate partner violence and " 'paradoxical behavior' " of alleged victims, including lying, recantation, minimization, and self-blame. In addition, Karen Quesada, a forensic nurse examiner, testified generally about strangulation.

 2. Defense Evidence

Wong testified that C.K. had moved into his apartment about five months before the April 2021 incident and, by the time of trial, he had been living in the same apartment for about eight years.

On the night of April 18, Wong drank "roughly five or six" beers over the course of about five hours at the sports bar, while C.K. drank some shots of hard liquor. The two left the bar and went to C.K.'s friend's house, where they socialized from 12:30 a.m. until about 2:00 a.m. There, Wong drank about two or three more beers. As Wong began singing karaoke, he saw C.K. walk into a bathroom with a man. They remained in the bathroom for a few minutes with the door closed. Wong thought C.K. might be cheating on him. He became uncomfortable and upset. When Wong asked C.K. what had transpired in the bathroom, she "was very vague and didn't really give [him] a response; so [he] asked to leave . . . the party."

Back at their apartment, Wong was "buzzed" but feeling "levelheaded." As C.K. prepared for bed, Wong continued asking her what had happened,

5

but she was "trying to avoid it, avoid the questions."  Wong "pressed the issue," and C.K. "became aggressive and somewhat violent."  Wong then broke up with C.K. and told her to leave his apartment, because he was upset and did not want to share a bed with an unfaithful woman.  After C.K. refused to leave, as "a bluff" Wong told her he was going to call the police.  C.K. was "[a]ggressive" and "[a]ngry" and "called [his] bluff."

Wong responded by saying he would leave.  He headed into the bedroom's walk-in closet to get a jacket.  C.K. followed Wong, began shoving him, and started screaming that he was not going anywhere.  Wong tried to exit the closet, but C.K. blocked the doorway and continued pushing him and screaming that he was not going anywhere.  He used his hands to try to move her out of the way so that he could leave.[6]  As Wong tried to "scoot" past C.K., they "wound up" on the carpeted floor, "kind of like wrestling around."

Wong managed to break free and entered the living room.  C.K. followed him and blocked him from exiting the apartment's front door by shoving him backward.  They wrestled and wound up on the floor again.  C.K. grabbed Wong's testicles and would not let go.  He screamed in pain.  He told C.K she was going to kill him and screamed at the top of his lungs.  When she attempted to cover his mouth, he bit down on her hand.  C.K. let go of Wong, screamed, and left the apartment.  Throughout all their wrestling, Wong did not punch C.K. or grab her by the neck.

After C.K. went to their neighbor's apartment, Wong grabbed his phone, keys, and jacket and walked to the apartment's front parking lot.  Wong testified that he told the police "[a] majority" of what had occurred that night but did not tell them about C.K. having punched him, shoved him, or

---

[6] Wong testified that he is 5 feet 10 inches tall, 160 pounds, and C.K. is 5 feet 9 inches tall, 200 pounds.

grabbed his testicles. He withheld information from the police because he did not want to get C.K. into trouble and jeopardize her ability to care for her young daughter. He also was embarrassed to report having been beaten up by a woman.

Wong testified that before the April 2021 incident, nothing like that incident had happened between him and C.K. However, "about two or three" other similar incidents had occurred after the April 2021 incident. The police were not involved in those later incidents.[7]

On cross-examination, Wong admitted that he did not tell the police that he had wrestled with C.K., that she had grabbed his testicles, or that he had bitten her. He also admitted that he told the police the abrasions on his elbows came from his cat.

Wong's "very good friend" since 2015 testified that Wong had always been there when she needed something, and he helped her when she needed work done at her house. She trusted Wong wholeheartedly and gave him a key to the house she shared with her children. She never witnessed Wong acting frustrated or upset. When she became frustrated, he always tried to reassure her that things were okay and brought a sense of calm. She considered the allegations of violence by Wong as inconsistent with what she knew about him.

Another friend of Wong's (who knew him for eight years and had dated him for three years) testified that Wong was honest, peaceful, kind, and gentle. She considered the allegations of domestic violence against Wong inconsistent with his peaceful character.

---

[7] The trial court sustained the prosecutor's objection to defense counsel's question asking Wong "what exactly happened" during the later incidents.

B. *Verdict and Sentence*

The jury found Wong guilty of inflicting corporal injury on a cohabitant (count 1) and assault by means of force likely to produce great bodily injury (count 2). The jury found Wong not guilty of criminal threats (count 3).

The trial court suspended imposition of sentence, placed Wong on three years of formal probation with conditions, and ordered him to serve 45 days in county jail.

## II. DISCUSSION

Wong contends the trial court erred and violated his constitutional right to present a defense by precluding his testimony about C.K.'s character for violence. He argues that the proffered evidence was highly probative, and that probative value was not substantially outweighed by the potential for undue consumption of time. Wong further claims that the trial court's error was prejudicial under both *Chapman v. California* (1967) 386 U.S. 18 and *People v. Watson* (1956) 46 Cal.2d 818.

The Attorney General responds that the trial court properly precluded Wong's testimony based on the likelihood of undue consumption of time and the proffered testimony was cumulative. The Attorney General further asserts that Wong forfeited the claim that his constitutional rights were violated and, in any event, no constitutional violation occurred. Lastly, the Attorney General contends any error by the trial court was harmless under *Watson*.

A. *Additional Background*

As mentioned *ante* (pt. I.A.2.), during Wong's direct testimony, he stated that "about two or three" other incidents "like" the one on April 19 had occurred subsequently between C.K. and him, but the police were not called. When defense counsel asked Wong "what exactly happened" during those

8

other incidents, the prosecutor objected on relevance grounds. The trial court sustained the prosecutor's objection. Defense counsel requested a bench conference, and the court held an off-the-record conference in chambers. After the chambers conference, the court reaffirmed its ruling in open court.

Later, outside the presence of the jury, the trial court described the chambers conference. The court recounted that defense counsel said "she was introducing this under [Evidence Code section] 1103 to show character trait of the victim. And these were incidents to show that [C.K.] was acting in conformance with that character trait." Defense counsel added to the court's summary. Counsel stated that she had attempted to introduce evidence of C.K.'s violent character to show that C.K. acted on April 19 in "conformity with that trait that Mr. Wong would be able to give an opinion about."

The prosecutor responded that "a victim's character for violence is only relevant as it relates to self-defense." Since the incidents Wong sought to introduce occurred after the incident in this case, the People "objected that subsequent conduct was irrelevant to prove [] [Wong]'s state of mind as it relates to any self-defense claim from the night of the incident."

The trial court explained that it had sustained the prosecutor's objection because "th[e] subsequent conduct is irrelevant to demonstrate what [] [Wong]'s state of mind was in the effort to make a self-defense claim."

After Wong completed his testimony, defense counsel provided the trial court two appellate opinions supportive of her earlier argument and renewed her request to present evidence about the subsequent incidents pursuant to Evidence Code section 1103.[8] Counsel asserted that *Shoemaker* "points out

---

[8] Defense counsel provided the trial court *People v. Shoemaker* (1982) 135 Cal.App.3d 442 (*Shoemaker*), which held that "evidence of the victim's subsequent acts of violence . . . is relevant and admissible under [Evidence Code] section 1103 to prove the victim's violent character at the time of the

9

how subsequent conduct can also be relevant . . . to just show a person's character" and *Rowland* discussed the relevance as to witness credibility.

The prosecutor reiterated that the victim's character for violence is only relevant to self-defense. The prosecutor also argued that the subsequent incidents "are not probative to show what actually occurred" on April 19th, "especially since, as the evidence stands now, both [C.K.] and Mr. Wong have talked about how [C.K.] was the alleged initial aggressor." The prosecutor concluded, "I think under [Evidence Code section] 352 the probative value is minimal. And absent any further evidence to corroborate those subsequent incidents, the prejudicial value is also high."

The trial court remarked that C.K.'s and Wong's accounts of the April 19 incident were not "180 degrees from the other" and the differences in their stories "are somewhat nuanced." The court accepted "for the sake of argument" "that evidence of subsequent conduct . . . can be admissible to prove a victim's character trait and to prove conduct consistent with that character trait" and that the proffered evidence also is relevant as to whom the jurors should believe. The court further observed that Wong's proposed testimony is "obviously not relevant to self-defense because [Wong] didn't know anything about it because it hadn't happened yet."

The trial court explained that it had "a bigger issue with undue consumption of time" under Evidence Code section 352. The court noted that if Wong were permitted to testify about the additional incidents, the court "would have to permit the recall of [C.K.] for her version of what happened. And if her version is different [than Wong's], we're going to be in a situation

_____

earlier crime" (*id*. at p. 448), and *People v. Rowland* (1968) 262 Cal.App.2d 790, which concluded, "It is now permissible under section 1103 of the Evidence Code to prove the aggressive and violent character by specific acts of the victim on third persons" (*id*. at p. 797).

of litigating those events and trying to get the jury to decide what happened on those two and then decide . . . whether or not that proves whether she had a character trait for violence and acted in conformance with that character on the date in question here that took place before."  The court also noted that the prosecution would be allowed to present evidence rebutting the defense's character evidence, which likely would take time for the prosecution to marshal.

The trial court further explained that it was "not sure" of the evidence's probative value:  "It doesn't seem to be particularly probative.  I think it's relevant but we have testimony from . . . [C.K.] and from [] [Wong], regarding what happened in this event.  They're not particularly at odds with each other.  I mean, she's now saying that, maybe [she] was the aggressor or certainly [she] was pushing him first before he pushed [her], and he didn't hit [her].  . . .  I don't think she necessarily contradicted herself on the biting, but I think that there's a nuanced difference between their opinions.  And I believe that to fully litigate that issue, to find out whether or not this evidence is really probative of anything, is going to require an undue consumption of time."

The trial court concluded:  "So assuming arguendo that . . . it's relevant to [C.K.'s] status as an aggressor or as to who is the aggressor, I think it's . . . excludable as the probative value is outweighed by the potential for undue consumption of time."

Defense counsel responded to the trial court's ruling by noting her expectation that Wong's testimony on the other incidents would be "brief" and the prosecution's rebuttal would not amount to "an undue consumption of time."

11

The trial court acknowledged the potential for brief testimony by Wong but noted that "the People would want to bring [C.K.] back." The court continued: "[A]nd then anticipate, given [C.K.'s prior] testimony, that she's going to say, yeah, [she] was the aggressor in those [later incidents] and [she] tried to beat him up and so forth, essentially giving testimony that she was at fault and, yes, she has a character for violence." The trial court observed that although the prosecutor had not requested a continuance, the court, based on its experience, anticipated "a request for a continuance to find witnesses. And who knows how long that would take. But in any event, . . . I'm not going to permit [the proffered evidence]."

The trial court instructed the jury on Wong's claim of self-defense with CALCRIM Nos. 3470, 3471, and 3472.

During closing argument, the prosecutor described this matter as "a messy case" and said, "really what it comes down to is credibility of witnesses." The prosecutor asserted that C.K.'s statements about the April 19 incident had evolved over time "from what actually took place . . . to trying to minimize at the preliminary hearing. . . . And now she's changed her desire[d] story to convince all of [the jurors] that [] [Wong] did not do the things that she initially said he did." The prosecutor contended that C.K.'s initial statements on April 19 should be believed because they were corroborated by other evidence. The prosecutor also argued that if the jurors believed that C.K. "told the truth on the night of the incident, self-defense doesn't even apply."

B. *Legal Principles*

Generally, character evidence is inadmissible. (Evid. Code, § 1101, subd. (a).) However, under Evidence Code section 1103, subdivision (a)(1), "in a criminal action, the defendant is permitted to offer evidence of the

12

victims 'character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)' in order 'to prove conduct of the victim in conformity with the character or trait of character.' [Citation.]  Once the defendant has offered such evidence, the prosecution is permitted to offer its own character evidence of the victim to rebut the defendant's evidence.  (Evid. Code, § 1103, subd. (a)(2).)  Further, if the defendant has offered 'evidence that the victim had a character for violence or a trait of character tending to show violence,' the prosecution is permitted to offer 'evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)' in order 'to prove conduct of the defendant in conformity with the character or trait of character.'  ([Evid. Code,] § 1103[, subd.] (b) . . . .)  In other words, if . . . a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that (1) the victim was not a violent person, and (2) the defendant was a violent person, from which the jury might infer it was the defendant who acted violently."  (*People v. Fuiava* (2012) 53 Cal.4th 622, 695–696, italics omitted.)

"[T]he trial court may exclude otherwise admissible evidence pursuant to Evidence Code section 352 if admitting the evidence would have confused the issues at trial, unduly consumed time, or been more prejudicial than probative."  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828.)

" 'A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion.' "  (*People v. Clark* (2016) 63 Cal.4th 522, 586.)  "A trial court's decision to admit or exclude evidence ' " 'will not be disturbed unless there is a showing that the

trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' " ' " (*People v. Mataele* (2022) 13 Cal.5th 372, 413–414.)

"In general, the ' "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 998; cf. *Crane v. Kentucky* (1986) 476 U.S. 683, 690 ["[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' "].) Our Supreme Court has "recognized, however, that Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of significant probative value to his or her defense. [Citation.] [¶] Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right. [Citation.] Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in [*Watson*]." (*Cunningham*, at pp. 998–999, italics omitted; see also *People v. Homick* (2012) 55 Cal.4th 816, 865 [" 'Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor [citations], "[t]his does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than 'slight-relevancy' to the issues presented." ' "].)

Wong acknowledges that evidentiary rulings are typically reviewed for an abuse of discretion. He, nonetheless, contends that "de novo" review applies "[w]here the error implicates constitutional concerns." Wong cites *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, footnote 7 and *People v.*

14

*Seijas* (2005) 36 Cal.4th 291, 304 to support his contention. The Attorney General does not specifically address Wong's contention regarding the appropriate standard of review for his constitutional claim.

Notwithstanding the contextual differences between the present case and *Albarran* and *Seijas*, we assume for purposes of this decision that the de novo standard of review applies in determining whether the trial court's exclusion of Wong's testimony regarding C.K.'s character for violence was so extensive as to violate Wong's constitutional right to present a defense. (See *People v. Mayo* (2006) 140 Cal.App.4th 535, 553 ["We review the trial court's determination as to the admissibility of evidence . . . for abuse of discretion [citations] and the legal question whether admission of the evidence was constitutional de novo (*People v. Cromer* (2001) 24 Cal.4th 889, 893–894)."].)

C. *Analysis*

Before we determine whether the trial court prejudicially erred by excluding Wong's testimony about the two or three later incidents between C.K. and him, we address the Attorney General's contention regarding forfeiture. The Attorney General asserts that Wong forfeited his current constitutional claim because, at trial, Wong failed to argue that the application of Evidence Code section 352 to preclude his testimony would amount to a constitutional violation. Although Wong did not mention his right to present a defense when seeking to admit his testimony, we conclude the application of forfeiture to his current constitutional claim is unnecessary because that claim "is merely a gloss" on his argument for admission of evidence at trial. (See *People v. Riggs* (2008) 44 Cal.4th 248, 292; see also *People v. Cowan* (2010) 50 Cal.4th 401, 464, fn. 20; Evid. Code, § 354.)

Furthermore, we note that despite defense counsel's failure to explicitly mention Wong's right to present a defense, the *Shoemaker* opinion (which

counsel provided to the trial court and which the court reviewed) addressed a claim that the exclusion of proffered character evidence violated the defendant's constitutional right to present a defense. (See *Shoemaker*, *supra*, 135 Cal.App.3d at p. 450.) Thus, Wong's counsel seemingly alerted the trial court to the applicability of that constitutional right when she relied on *Shoemaker* in pressing for the admission of Wong's testimony.[9] (See *In re Sheena K.* (2007) 40 Cal.4th 875, 881; *People v. Williams* (1988) 44 Cal.3d 883, 906.)

Turning to the merits of Wong's claim of error, as mentioned *ante*, he contends the trial court erred under Evidence Code section 352 because the probative value of the excluded testimony about C.K.'s character for violence was not substantially outweighed by the potential for undue consumption of time. For the purposes of this decision, we assume arguendo that the trial court abused its discretion by excluding Wong's proffered testimony about C.K.'s character for violence—namely, the details of the later incidents between C.K. and him. Nevertheless, for the reasons below, we conclude the exclusion of that testimony did not violate Wong's constitutional right to present a defense and was not prejudicial.

Before the trial court sustained the prosecutor's objection to the details of the later incidents, Wong had testified that he and C.K. experienced incidents like the one on April 19 "about two or three more times" after that date. Although the trial court precluded Wong from providing details about those later incidents, the jurors learned that those other incidents happened and had reason to believe that the additional incidents were, from Wong's

---

[9] Because we reject the application of forfeiture and will review Wong's constitutional claim on the merits, we do not address his alternative claim of ineffective assistance of counsel, raised in his supplemental opening brief.

perspective, "like" the April 19 incident. Put differently, the admitted testimony informed the jurors that C.K. had again acted aggressively toward Wong during the subsequent incidents and he had to defend himself from C.K.'s violence. Defense counsel, in fact, leveraged Wong's testimony about the similar, subsequent incidents during her closing argument. Counsel alluded to C.K.'s other acts of violence to argue that there was no "cycle of domestic violence" in this case because the jurors "did not hear that there had been any incidents involving Mr. Wong and [C.K.], *at least not with* [*C.K.*] *being the victim*." (Italics added.)

Because evidence about C.K.'s subsequent violent conduct was not wholly excluded from the jury's consideration, we conclude there was no violation of Wong's constitutional right to present a defense. (See *People v. Bell* (2007) 40 Cal.4th 582, 610 & fn. 10, disapproved of by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; *People v. Cornwell* (2005) 37 Cal.4th 50, 82, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Hawthorne* (1992) 4 Cal.4th 43, 58.)

Given that the trial court's ruling excluding the details of the subsequent incidents as related to C.K.'s character for violence did not violate Wong's constitutional rights, we apply the *Watson* standard to decide whether the court's evidentiary ruling was prejudicial. The *Watson* "standard requires us to evaluate whether the defendant has demonstrated that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195.)

Wong fails to persuade us that a more favorable outcome would have resulted if the trial court had permitted him to testify about C.K.'s character for violence and the "two or three" additional incidents. Wong did not provide

17

an offer of proof about his intended testimony. We therefore assume that any testimony about the other incidents would only have included details of aggressive behavior by C.K. akin to that Wong described for the April 19 incident.

Given that the jurors were informed that other similar incidents had in fact occurred, further details of those incidents would have been cumulative and, thus, would have only marginally affected the jurors' consideration of whether C.K., in fact, was the aggressor on April 19 and Wong simply defended himself. Furthermore, the prosecution presented persuasive corroborating evidence (including evidence of C.K.'s injuries) to support its theory that C.K.'s initial statements to 911 and Officer Taylor were truthful and that C.K. was motivated to subsequently alter her account of the April 19 incident to protect her fiancé from criminal liability. The jurors, likewise, heard about C.K.'s prior conviction for selling a controlled substance and were told they could consider that conviction in evaluating C.K.'s credibility. Thus, the jurors were aware of other evidence about C.K.'s character that was relevant to their assessment of her veracity.

On this record, we conclude that any error in precluding Wong's testimony about C.K.'s character for violence and the "two or three more times" that C.K. acted violently toward him like she had on April 19 was not prejudicial to the result of Wong's trial.

### III. DISPOSITION

The judgment is affirmed.

_____
Danner, Acting P. J.

WE CONCUR:

_____
Wilson, J.

_____
Bromberg, J.

**H051737**
***People v. Wong***